Slip Op. 20-170

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NOVOLIPETSK STEEL PUBLIC JOINT STOCK COMPANY and NOVEX TRADING (SWISS) SA,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | |
| **Defendant,** | **Court No. 19-00172** |
| | **PUBLIC VERSION** |
| **and** | |
| **NUCOR CORPORATION,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's final determination in the 2016–2017 administrative review of the antidumping duty order on certain hot-rolled flat-rolled carbon-quality steel products from the Russian Federation.]

Dated: November 30, 2020

Valerie Ellis, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for plaintiffs Novolipetsk Steel Public Joint Stock Company and NOVEX Trading (Swiss) SA. Also on the briefs were Daniel L. Porter, Tung Nguyen, and Kimberly Reynolds.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. Also on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Brandon J. Custard, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Court No. 19-00172                                                                 Page 2
**PUBLIC VERSION**

Cynthia C. Galvez and Christopher B. Weld, Wiley Rein, LLP, of Washington, D.C., argued for defendant-intervenor Nucor Corporation.  Also on the brief were Alan H. Price and Jeffrey O. Frank.

Kelly, Judge:  Before the court is Plaintiffs Novolipetsk Steel Public Joint Stock Company ("NLMK") and NOVEX Trading (Swiss) SA's ("NOVEX") Rule 56.2 motion for summary judgment on the agency record challenging several aspects of the U.S. Department of Commerce's ("Commerce") final determination in its 2016–2017 administrative review of the antidumping duty ("ADD") order on certain hot-rolled flat-rolled carbon-quality steel products ("HRC") from the Russian Federation ("Russia").  See [Pls.'] Mot. J. Agency R., Feb. 13, 2020, ECF No. 26;  see also [HRC from [Russia], 84 Fed. Reg. 38,948, 38,949 (Dep't Commerce Aug. 8, 2019) (final results and rescission of [ADD] admin. review; 2016–2017) ("Final Results") and accompanying Issues & Decision Memo. for the [Final Results], A-821-809, (Aug. 2, 2019), ECF No. 21-5 ("Final Decision Memo").  Plaintiffs challenge Commerce's decision to rescind its administrative review of NLMK as both contrary to law and unsupported by substantial evidence.  See Pls.' Opening Br. Supp. 56.2 Mot. J. Agency R. Confidential Version, Feb. 13, 2020, ECF No. 26-1 ("Pls.' Br.").  Specifically, Plaintiffs contest Commerce's decision to analyze the bona fides of NLMK's sale of subject merchandise into the United States, see id. at 5–14, determination that NLMK's U.S. sale is not bona fide, see id. at 14–46, and resultant decision to rescind the administrative review.  See id. at 46–52.  Plaintiffs also submit that Commerce's rescission results in the impermissible application of facts available with an adverse

inference ("adverse facts available" or "AFA")[1] to NLMK.  See id. at 52–55.  For the following reasons, the court sustains Commerce's decision to rescind the administrative review.

## BACKGROUND

On October 15, 1998, Commerce initiated a less-than-fair-value ("LTFV") investigation of HRC from Russia.  See [HRC from Brazil, Japan, and [Russia], 63 Fed. Reg. 56,607, 56,613 (Dep't Commerce Oct. 22, 1998) (initiation of [ADD] investigations) ("Initiation of ADD Investigations").  On July 12, 1999, Commerce entered into a Suspension Agreement with the Ministry of Trade of the Russian Federation.[2]  See [HRC] from [Russia], 64 Fed. Reg. 38,642, 38,642 (Dep't of Commerce July 19, 1999) (suspension of [ADD] investigation).  However, at the request of petitioners, Commerce continued the investigation and made an affirmative final determination of sales at LTFV.  See [HRC] from [Russia], 64 Fed. Reg. 38,626, 38,626–27 (Dep't Commerce July 19, 1999) (notice of final determination

---

[1] Parties and Commerce sometimes use the shorthand "AFA" or "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination.  However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available."  See 19 U.S.C. § 1677e(a)–(b).

[2] Commerce is permitted "to suspend an [ADD] . . . investigation by accepting a suspension agreement[.]"  See 19 C.F.R. § 351.208 (1999).

of sales at [LTFV]) ("HRC from Russia").   Given that Russia was considered a

nonmarket economy at the time, Commerce calculated a country-wide, or Russia-

wide, dumping margin of 184.56 percent based on total AFA.[3]  See id., 64 Fed. Reg.

at 38,641.   Nonetheless, Commerce did not issue an ADD order because of the

Suspension Agreement.

---

[3] In antidumping proceedings, Commerce estimates the "weighted average dumping margin for each exporter and producer individually investigated" and the "all-others rate for all exporters and producers not individually investigated." 19 U.S.C. §§ 1673b(d)(1)(A), 1673d(c)(1)(B)(i); see also 19 C.F.R. §§ 351.205, 351.210 (2018).  The all-others rate is the "amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title" (i.e., based on facts available). 19 U.S.C. § 1673d(c)(5); see also id. at § 1677e.

In proceedings involving a nonmarket economy, Commerce presumes exporters and producers are under foreign government control with respect to export activities, and will assign a single "country-wide" rate unless a respondent demonstrates it qualifies for a separate rate.  See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1373 (Fed. Cir. 2013) ("Yangzhou") (citing Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997)); see also 19 C.F.R. § 351.107(d) (1999).

Here, Commerce selected Novolipetsk Iron & Steel Corporation ("NISCO") as a mandatory respondent in its initial investigation.   See Initiation of ADD Investigations, 63 Fed. Reg. at 56,607; [HRC] from [Russia], 64 Fed. Reg. 9,312, 9,314 (Dep't Commerce Feb. 25, 1999) (notice of prelim. determination of sales at [LTFV]). However, NISCO subsequently withdrew from participation in the investigation. See HRC from Russia, 64 Fed. Reg. at 38,628.  Commerce used total AFA to derive the Russia-wide rate because certain respondents did not respond to Commerce's request for information and Commerce could not verify, inter alia, NISCO's questionnaire response due to its withdrawal.  See id., 64 Fed. Reg. at 38,630.

In 2014, years after granting Russia market economy status for purposes of applying U.S. antidumping laws, Commerce terminated the Suspension Agreement and issued the [ADD] order covering HRC from Russia.  <u>See</u> <u>Termination of the Suspension Agreement on [HRC] from [Russia], Rescission of 2013–2014 Admin. Review, and Issuance of [ADD] Order</u>, 79 Fed. Reg. 77,455 (Dep't Commerce Dec. 24, 2014) ("<u>ADD Order</u>").  Commerce set the cash deposit rate equal to margins calculated in the final determination of its initial investigation, using the 184.56 percent Russia-wide rate as the all-others rate.[4]  <u>See</u> <u>HRC from Russia</u>, 64 Fed. Reg. at 38,641; <u>ADD Order</u>, 79 Fed. Reg. at 77,456.

On December 29, 2017, after making an entry and sale of HRC from Russia, Plaintiffs requested an administrative review of the <u>ADD Order</u>.  <u>See</u> Compl. at ¶¶ 6–8, 10, Sept. 9, 2019, ECF No. 6; NLMK's Req. for Admin. Review: [HRC] from Russia, PD 3, bar code 3656817-01 (Dec. 29, 2017).[5]  Commerce initiated this administrative review and preliminarily determined that Plaintiffs' sale did not constitute a bona fide sale.  [HRC] from [Russia], 84 Fed. Reg. 4,776 (Dep't Commerce

---

[4] NLMK and NOVEX failed to timely challenge the all-others rate when the suspension agreement was terminated and the <u>ADD Order</u> issued,  <u>see</u> <u>Novolipetsk Steel Pub. Joint Stock Co. v. United States</u>, 44 CIT __, Slip Op. 20-58 (May 1, 2020), and now seeks a new rate after having made the entry at issue in this proceeding.

[5] On October 28, 2019, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 21-1 and 21-2, respectively.  All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

Feb. 19, 2019) (prelim. results of [ADD] admin. review; 2016–2017) ("Prelim. Results") and accompanying Decisions Memo. for the [Prelim. Results] at 7–8, A-821-809, PD 108, bar code 3792089-01 (Feb. 11, 2019).[6]  For its final determination, Commerce continued to find that Plaintiffs did not make a bona fide sale.  Final Decision Memo at 17–18.  As such, Commerce continued to assign to NLMK's entries the "all-others" rate of 184.56 percent.  See id.; see also Final Results, 84 Fed. Reg. at 38,949.  NLMK and NOVEX's appeal to this court ensued.  See generally Compl.; Summons, Sept. 9, 2019, ECF No. 1.  On September 21, 2020, the court heard oral argument.  See Oral Arg., Sept. 21, 2020, ECF No. 49.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[7] and 28 U.S.C. § 1581(c) (2018), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[6] Commerce later published a correction notice not relevant to this dispute.  See [HRC] from [Russia], 84 Fed. Reg. 16,643 (Dep't Commerce Apr. 22, 2019) (correction to the prelim. results of the 2016–2017 admin. review).

[7] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

## DISCUSSION

I.    **Commerce's Decision to Analyze Bona Fide Sales**

  A.  **Commerce's Authority Under 19 U.S.C. § 1675**

Plaintiffs argue that 19 U.S.C. § 1675 does not allow Commerce's bona fide sales analysis in an administrative review.  See Pls.' Br. at 5–10.  Namely, Plaintiffs submit that Congress's amendment of § 1675(a) to require a bona fide sales analysis of U.S. sales in a new shipper review under § 1675(a)(2)(B)(iv) demonstrates that Commerce does not have statutory authority under § 1675(a)(2)(A) to analyze the bona fides of a U.S. sale in an administrative review.  See id.; see also Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), Pub. L. No. 114-125, § 433, 130 Stat. 122 (2016).  Defendant and Defendant-Intervenor counter that the court should defer to Commerce's interpretation of its authority in light of Congressional silence on the issue and that Commerce's practice of applying a bona fide sales analysis in an administrative review is consistent with its statutory mandate.  See Def.'s Memo. Opp'n Pls.' Mot. J. Agency R. Confidential Version at 10–15, Apr. 17, 2020, ECF No. 30 ("Def.'s Br."); Def.-Intervenor [Nucor's] Resp. Br. Confidential Revised Version at 12–23, Apr. 17, 2020, ECF No. 33 ("Nucor's Br.").  For the following reasons, the court holds that Commerce's bona fide sales analysis in an administrative review is in accordance with law.

Section 1675(a)(2)(A) provides that, when conducting an administrative review of an ADD order, Commerce shall determine "the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry." 19 U.S.C. § 1675(a)(2)(A). This directive reflects Commerce's authorization under 19 U.S.C. § 1673(1) to impose antidumping duties, in an amount equal to the amount by which normal value exceeds the export price (or constructed price), on "a class or kind of foreign merchandise" that it determines "is being, or is likely to be, sold in the United States at less than its fair value[.]"[8]

Section 1675(a)(2)(A) is capacious enough to accommodate Commerce's authority to examine which sales it will consider for purposes of establishing a dumping margin in an administrative review in some circumstances. Section 1675(a)(2)(A) dictates how Commerce determines antidumping duties in an administrative review of an ADD order stemming from an investigation pursuant to 19 U.S.C. § 1673. Under § 1675(a)(2)(A), Commerce must calculate the normal value,

---

[8] After determining that merchandise is being (or is likely to be) entered and sold in the United States at LTFV, and if the U.S. International Trade Commission determines that imports of the merchandise cause (or threaten to cause) material injury to a domestic industry, Commerce issues an ADD order requiring that antidumping duties be assessed on the merchandise at an amount by which the normal value of the merchandise exceeds its export price (or constructed export price). 19 U.S.C. § 1673. Provided that it receives timely requests, Commerce is statutorily required to conduct periodic administrative reviews of an ADD order to determine the amount of antidumping duties owed on each entry of subject merchandise during the relevant period of review ("POR"). See 19 U.S.C. § 1675(a)(1)–(2).

export price, and dumping margin of each entry of subject merchandise.  See id. at § 1675(a)(2)(A).  The statute prescribes methodologies for determining normal value and export price.  See, e.g., 19 U.S.C. §§ 1677a, 1677b.  Export price is defined as the "price at which the subject merchandise is first sold (or agreed to be sold)," § 1677a, but the statute does not provide for what constitutes a sale.  Commerce thus has discretion to provide a reasonable interpretation for what constitutes a sale for purposes of conducting an administrative review under § 1675(a)(2)(A).

Given 19 U.S.C. §§ 1675(a)(2)(A) and 1677a's silence with respect to the issue of what constitutes a sale, it is reasonable for Commerce to disregard sales that are not bona fide in an effort to calculate a dumping margin that suitably approximates an exporter or producer's selling practices.  See 19 U.S.C. §§ 1675, 1677a.  Doing so accords with Commerce's statutory purpose under § 1673 of determining whether goods are being sold at less than fair value.  See 19 U.S.C. § 1675(a)(2)(A); 19 U.S.C. § 1673(1).  See, e.g., Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("Ceramica") (citing, inter alia, Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, (1984) ("Chevron")).

The court cannot discern from Congress's amendments to § 1675(a)(2)(B) alone an intent to preclude Commerce's authority to analyze the bona fides of a U.S. sale in

an administrative review.[9]  Congress's amendments to § 1675(a)(2)(B) are not worded restrictively, but rather, impose an affirmative obligation on Commerce to ensure that U.S. sales used to calculate an individual margin for a new shipper are bona fide. The legislative history indicates that Congress was driven by concerns that exporters and producers were abusing the ability to obtain a new shipper rate on an expedited basis in order to circumvent antidumping and countervailing duties.  See H.R. REP. NO. 114-114, pt. 1, at 89 (2015).  Congress's statutory solution to circumvention in the context of a new shipper review does not on its own amount to a preclusion of Commerce's authority to conduct a bona fides sales analysis in an administrative review.  Indeed, Congress, in amending § 1675, did not make any changes to the provisions governing administrative reviews that would imply such an intent.  That Congress is presumed to be aware of Commerce's practice when it amended 19 U.S.C. § 1675 lends force to the notion that Congress's amendments do not speak to

---

[9] Exporters or producers not previously assigned a dumping margin may, under certain conditions, request a new shipper review.  Namely, if Commerce receives a request from an exporter or producer of the subject merchandise establishing that it did not export (and was not affiliated with an exporter or producer that did export) subject merchandise into the United States during the period of investigation giving rise to the ADD order, Commerce is statutorily required to calculate an individual weighted-average dumping margin for that exporter or producer.  See 19 U.S.C. § 1675(a)(2)(B)(i).  On February 24, 2016, Congress enacted section 443 of the TFTEA, and modified 19 U.S.C. § 1675(a)(2)(B) to require that Commerce only use bona fide sales as the basis for calculating an individual dumping margin in a new shipper review.

Commerce's practice within the context of an administrative review.[10]  See Lorillard

v. Pons, 434 U.S. 575, 580 (1978).  Accordingly, and as prior rulings from this Court

have recognized, it is reasonable for Commerce to interpret the statute as authorizing

it to disregard transactions it reasonably concludes are not bona fide sales.  See, e.g.,

Windmill Int'l Pte v. United States, 26 CIT 221, 230–32, 193 F. Supp. 2d 1303, 1312–

14 (2002).

### B.  Commerce Reasonably Exercised Its Discretion

Plaintiffs challenge Commerce's decision to conduct a bona fides analysis

because NLMK has a long history of exporting HRC to the United States, and the

importer of record, NOVEX, is its affiliated trading company.  See Pls.' Br. at 10–14.

Defendant counters that Commerce's decision to conduct a bona fides analysis is not

subject to review.  See Def.'s Br. at 16–17.  Nonetheless, Defendant and Nucor both

submit that Commerce's decision is reasonable in light of the facts and circumstances

of this proceeding.  See id. at 16–18; see also Nucor's Br. at 19–23.  For the following

reasons, the court holds that Commerce reasonably exercised its discretion.

---

[10] As such, the court is not persuaded by Plaintiffs' reliance on Thomas v. Nicholson
and Saha Thai Steel Pipe Pub. Co. Ltd. v. United States.  See Pls.' Br. at 8 (citing 423
F.3d 1279 (Fed. Cir. 2005); 43 CIT __, 422 F. Supp. 3d 1363 (2019)).  Those cases do
not deal with instances where Congress acted to codify a pre-existing agency practice
in one part of the statute, and do not touch on the issue of whether Congress, by its
silence, intended to revoke that practice in another part of the statute.

Commerce has an administrative practice under certain circumstances of analyzing the bona fides of U.S. sales in administrative reviews.  <u>Cf.</u> Final Decision Memo at 7; <u>see also</u> <u>Certain Oil Country Tubular Goods From Turkey</u>, 83 Fed. Reg. 64,107 (Dep't Commerce Dec. 13, 2018) (final results of [ADD] admin. review; 2016–2017) ("<u>OCTG from Turkey</u>") and accompanying Issues and Decisions Memo. for [<u>OCTG from Turkey</u>] at 10–11, A-489-816, (Dec. 7, 2018) available at https://enforcement.trade.gov/frn/summary/turkey/2018-26973-1.pdf (last visited Nov. 21, 2020) ("OCTG from Turkey IDM").  As explained by Commerce, "[w]hile bona fide sales analyses always arise in the context of new shipper reviews, if a producer's or exporter's transactions involve prices, quantities, or overall circumstances that are questionable, Commerce will evaluate the bona fides of the sale in the context of an administrative review."  Final Decision Memo at 8; <u>see also</u> OCTG from Turkey IDM at 10.  Contrary to Defendant's submission, Def.'s Br. at 16–18, the court may review Commerce's decision to conduct a bona fide sales analysis to determine whether it has reasonably explained any deviation from an agency practice.  <u>See</u> <u>Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade</u>, 412 U.S. 800, 808 (1973).  Further, although Commerce has authority to determine what constitutes a sale when calculating a dumping margin under 19 U.S.C. § 1675, the means by which it chooses to do so must be reasonable.  <u>See</u> <u>Chevron</u>, 467 U.S. at 843–44.

Here, Commerce's decision to examine the bona fides of NLMK's sale is reasonable.  It is reasonably discernible from Commerce's reference to the principle that "single sale[s] must be 'carefully scrutinized'" that Commerce is importing what was previously an agency practice of examining single sale transactions during a new shipper review into its methodology for conducting an administrative review.  See Final Decision Memo at 16 (citations omitted).  Further, Commerce's practice is reasonable in an administrative review; a single sale transaction may warrant further scrutiny because there are fewer transactions from which to draw inferences about the exporter or producer's selling practices.  See id. at 13; Prelim. Bona Fide Sales Analysis Memo. at 14, PD 111, CD 197, bar codes 3793192-01, 3793189-01 (Feb. 11, 2019) ("Bona Fides Sales Memo").  Thus, given its authority to disregard transactions that do not constitute bona fide sales, Commerce's practice of examining a single sale transaction is reasonable in an administrative review.

As such, Plaintiffs' arguments regarding NLMK's history of exporting into the United States are inapposite.  See Pls.' Br. at 10–14.  Under 19 U.S.C. § 1675(a)(2)(A), Commerce seeks to calculate a dumping margin that accurately approximates the exporter or producer's selling practices, and where the entry under review is based on a single transaction it is reasonable for Commerce to take a closer look to make sure the price was based on commercial considerations.  Doing so will enable Commerce to calculate a dumping margin that better approximates a respondent's

selling practices, which is consistent with Commerce's statutory purpose of determining whether merchandise is being sold at LTFV.

## II.   Whether NLMK's Entry is a Bona Fide Sale

Plaintiffs argue that Commerce's determination is unsupported by substantial evidence because the record does not support Commerce's conclusion that its sale is commercial unreasonable. See Pls.' Br. at 14–46. Defendant and Nucor counter that Commerce's determination is reasonable based on the record and that Plaintiffs' challenge amounts to a request for the court to reweigh the evidence. See Def.'s Br. at 23–40; Nucor's Br. at 23–41. For the following reasons, the court sustains Commerce's determination that NLMK's entry is not a bona fide sale.

Commerce employs a totality-of-the-circumstances approach to determine whether U.S. sales are bona fide in an administrative review. Similar to its practice in new shipper reviews, now codified in § 1675(a)(2)(B)(iv), Commerce explains that

> [It] consider[s] the following factors when determining if a sale is bona fide: (1) timing of the sale; (2) price and quantity; (3) expenses arising from the transaction; (4) whether the goods were resold at a profit; and (5) whether the transaction was made at arm's length. Thus, [Commerce] consider[s] a number of factors in [its] bona fide analysis, "all of which may speak to the commercial realities surrounding an alleged sale of subject merchandise."

Final Decision Memo at 11 (citations omitted). According to Commerce, "the weight given to each factor investigated will depend on the circumstances surrounding the sale[,]" and that it "is highly likely to examine objective, verifiable factors to ensure that a sale is not being made to circumvent an AD Order." Id. (citations omitted).

Court No. 19-00172                                                    Page 15
**PUBLIC VERSION**

Commerce's determinations must be supported by substantial evidence. The

evidence must be sufficient that a reasonable mind might accept the evidence as

adequate to support its conclusion while considering contradictory evidence. <u>See</u>

<u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938); <u>see also</u> <u>Suramerica de</u>

<u>Aleaciones Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994).

Here, Commerce offers several reasons for its determination that NLMK's U.S.

sale is not bona fide. First, with respect to the pricing and quantity of the sale, upon

comparison to NLMK's third-country sales, Commerce observes that the price of

NLMK's sale is significantly higher, and the quantity of the sale is significantly lower,

than other export transactions that NLMK made during the same period.[11] <u>See</u> Final

---

[11] Commerce maintains its finding that the price per unit of NLMK's U.S. sale was significantly higher than NLMK and NOVEX's other export sales made during the same period. Final Decision Memo at 12 (citing Bona Fides Sales Memo at 5–6). Specifically, Commerce explained

> Of NOVEX's [[        ]] third country sales, and NLMK's sole shipment of subject merchandise for [[        ]] metric tons (MT) with a per-unit value of USD 683.4 per MT had the third highest unit price of the [[        ]] third country sales – or a unit price higher than [[        ]] percent of NOVEX's export sales. The [[        ]] sales with the highest unit prices had a per unit value of USD [[        ]] per MT. The [[        ]] highest unit price of the third country sales was made at a substantially lower price of USD [[        ]] per MT. Additionally, an average of the unit prices of NOVEX's third country sales indicated that the three sales with the highest unit prices were made at prices significantly higher than the average - ranging from USD [[        ]] per MT above the average price of USD [[        ]] per MT. Given this information, we find that the per unit price of NLMK's sole U.S. sale is significantly higher than

(footnote continued)

Decision Memo at 12–14.  Second, Commerce cites email correspondences between

NLMK and its unaffiliated customer discussing the need to enter the merchandise

before the end of the period of review ("POR") in order to revoke the ADD order on

HRC from Russia as evidence that the timing of the sale did not arise out of ordinary

commercial considerations.  See id. at 14 (citing Bona Fides Sales Memo at 7, 8–11).

Third, although Commerce notes that NLMK had previously conducted business with

its customer, Commerce points to email correspondences with NLMK dictating the

terms of the sale as evidence that the transaction was not negotiated at arms-length,

which Commerce defines as being based on independent business interests.  See id.

at 14–15 (citing Bona Fides Sales Memo  at 8–13).  Finally, with respect to other

relevant factors, Commerce notes NLMK/NOVEX's contradictory statements about

the merchandise when urging the customer to make the purchase, see id. at 15 (citing

Bona Fides Sales Memo at 9–11),[12] the failure of NLMK's customer to adhere to the

---

NLMK's/NOVEX's other export sales made during the same period.
Thus, we find that the price of NLMK's POR sale is not representative
of a normal business practice and, does not indicate that the sale is bona
fide.

Bona Fides Sales Memo at 6 (citations omitted).

[12] Commerce explained

Next, email correspondence indicates that NLMK/NOVEX made
contradictory statements to justify the shipment of certain hot-rolled
coils[.] [[              ]] stated in emails that [[        ]] hot-rolled coils
produced to these specifications had been found in inventory and were

(footnote continued)

payment terms, the refusal of NLMK's sales agent to provide certain financial

statements, <u>see</u> <u>id.</u> at 16, and the fact that only a single sale was made during the

POR as evidence that NLMK's sale is atypical.  <u>See</u> <u>id.</u>

      Commerce's determination that NLMK's U.S. sale is not bona fide is supported

by substantial evidence.  First, it is reasonable that Commerce infers, from email

exchanges documenting instances where the seller directed the terms of the sale for

its customer, that NLMK's transaction was not negotiated at arms-length.[13]

---

      left over from a previous order for [[            ]] and NLMK also
      asserted on the record that "[[

                       ]] However, previously in a separate submission,
      NLMK explained that it had not sold hot-rolled steel to [[          ]]
      since the demise of the suspension agreement in 2014. We also note that
      record evidence from the sales trace for the sole U.S. sale during the
      POR indicates that these [[        ]] hot-rolled coils were produced just
      prior to shipment in 2017. As such, record evidence indicates that
      NLMK and NOVEX made contradictory statements to justify the
      shipment of certain hot-rolled coils prior to the end of the POR, which
      the final customer was [[                 ]], even though it
      had requested a different product to be shipped to [[            ]],
      rather than [[                  ]].

Bona Fides Sales Memo at 10.

[13] Record evidence suggests that the customer entered into the transaction as a favor
to NLMK.  Commerce cites an email exchange demonstrating that the customer
planned to purchase HRC produced to one of [[         ]] specifications [[

                                 ]] requested  <u>See</u>
Bona Fides Sales Memo at 8–11 (citing, inter alia, NLMK Third Suppl. Questionnaire
Resp. at Ex. SA3-2, CD 188, bar code 3746640-02 (Aug. 21, 2018)).  NLMK/NOVEX
would [[

                      ]] in order to initiate the administrative
review.  <u>See</u> <u>id.</u>; <u>see also</u> Final Decision Memo at 14 & n.61.

Commerce observes that an arms-length transaction is one that is negotiated based on independent interests, Final Decision Memo at 14 (citations omitted), and it is reasonable to infer from evidence that demonstrates a customer is setting its terms based on the producer's preferences that the customer is not negotiating based on its own independent interests.[14]   Second, without detracting evidence explaining the significant difference in pricing and quantity between its U.S. sale and its third country transactions, and given record evidence demonstrating NLMK's motivations for making the U.S. sale, the pricing of NLMK's transaction reasonably suggests the price is artificially inflated to reduce NLMK's dumping margin.  A higher price for NLMK's U.S. sale would lead to a lower dumping margin by narrowing, if not eliminating, the difference between the export price and normal value of the sale. Taken together with the rest of Commerce's findings, see Final Decision Memo at 15–16, the court cannot say that it is unreasonable for Commerce to conclude, based on the totality of the circumstances, that NLMK's U.S. sale was not bona fide.  That Plaintiffs disagree is insufficient to demonstrate Commerce's determination is

---

[14] Plaintiffs argue that a sale to an unaffiliated customer is, ipso facto, an arm's length transaction.  Pls.' Br. at 37–38 (citing, inter alia, AK Steel Corp. v. United States, 226 F.3d 1361, 1367 (Fed. Cir. 2000) ("AK Steel Corp.").  The passage from AK Steel Corp. that Plaintiffs cite discusses Commerce's methodology for deriving the export price (or constructed export price) under 19 U.S.C. § 1677a, and Plaintiffs otherwise fail to point to any legal authority limiting Commerce's discretion to make a record-based determination of whether a transaction is made at arms-length during its bona fide sales analysis.

unreasonable.[15]  See Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d

1369, 1376 (Fed. Cir. 2015); see also Zhejiang DunAn Hetian Metal Co. v. United

States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

Plaintiffs' challenges with respect to Commerce's examination of the price of

NLMK's sale arise from their position that Commerce's practice is merely to

determine whether the "price . . . is in line with general price trends in the U.S.

market." Pls.' Br. at 17 (citations omitted).[16]  As such, Plaintiffs contest Commerce's

---

[15] Plaintiffs disagree with the inferences Commerce draws from the record evidence. For example, Plaintiffs submit that Commerce's conclusion that record evidence of a late payment of 41 days weighs in favor of its finding that the transaction at issue was not bona fide is unsupported by substantial evidence.  See Pls.' Br. at 42–43. Instead of pointing to detracting evidence that would impugn the reasonableness of Commerce's conclusion, Plaintiffs cite their statement that "[o]n occasion, payment may lag with any customer in the ordinary course of business . . . [n]otwithstanding the payment terms, sometimes customers wait until the merchandise is delivered and examined before rendering payment." Pls.' Br. at 42 (citing Customer-Specific Suppl. Questionnaire Resp. at 9, PD 73, CD 143 bar codes 3735851-01, 3735845-01 (July 27, 2020)).  Proffering a reasonable inference to be drawn from the record, however, does not demonstrate that Commerce's determination is unreasonable.

[16] Plaintiffs rely in part on a bona fide sales analysis memorandum from the 2014–2015 administrative review of Commerce's ADD order on polyethylene retail carrier bags from Malaysia as support for their assertion, see Pls.' Br. at 17, but it is unclear from the final results of that review whether Commerce limits its examination as Plaintiffs argue.  See Polyethylene Retail Carrier Bags From Malaysia, 81 Fed. Reg. 75,378 (Dep't Commerce Oct. 31, 2016) (final results of the [ADD] admin. review; 2014–2015) ("Polyethylene from Malaysia") and accompanying Issues and Decisions Memo. for the [Polyethylene from Malaysia] at 6, A-557-813, (Oct. 24, 2016), available at https://enforcement.trade.gov/frn/summary/malaysia/2016-26220-1.pdf (last visited Nov. 21, 2016) ("Polyethylene from Malaysia IDM") ("U.S. import price data

(footnote continued)

reliance on NLMK's third country sales as a benchmark against which to evaluate

the price and quantity of their U.S. sale, maintaining that Commerce generally uses

data from U.S. Customs and Border Protection ("CBP") as well as U.S. International

Trade Commission ("ITC") Dataweb data containing broad monthly average prices

("CBP data" and "ITC data", respectively).[17]  See Pls.' Br. at 17–20 (asserting that

CBP and ITC data are the golden standard for purposes assessing the commercial

reasonableness of NLMK's sale).

     However, Commerce explains, that when analyzing the bona fides of a

transaction, "either as an alternative or in addition to the CBP data examination,

Commerce may also compare a respondent's selling price and quantity . . . to a

---

on the record indicate that the price of [the] sale was within the range of AUVs for comparable goods[.]").  Moreover, in Polyethylene from Malaysia, unlike here, Commerce found that the U.S. sale was "not reflective of a commercially unreasonable quantity, which is typically seen where parties attempt to 'test the waters' or manipulate the dumping margin." Polyethylene from Malaysia IDM at 6. Even if Commerce here deviates from a purported practice with respect to its examination of the price of NLMK's sale, it is apparent to the court that the deviation is reasonable, given the differing factual circumstances and the fact that Commerce here weighs the evidence based on the totality of the circumstances.

[17] Plaintiffs also argue that Commerce rejected the ITC and CBP data for conclusory reasons.  Pls.' Br. at 18 (citing Final Decision Memo at 13).  However, Commerce is not obliged to use these datasets given its  apparent practice of using third country sales data either in addition to, or as an alternative, to such sources.  See Final Decision Memo at 12–13.  Commerce reasonably explains that it prefers to use NLMK's third country sales as a benchmark in this instance because the raw data is transaction specific, unlike the ITC and CBP data.  Final Decision Memo at 12–13. Moreover, Commerce explains that the volume of NLMK's third country sales is substantial enough to avoid sample size concerns.  See id.  Plaintiffs fail to persuade that Commerce's approach in this instance is unreasonable.

respondent's own sales, whether these were made to third country markets or to the

United States before or after the POR." <u>See</u> Final Decision Memo at 12–13 (citations

omitted).[18]   In this instance, Commerce uses NLMK's third country sales as an

alternative because the ITC and CBP data do not provide information on a

transaction-specific basis. <u>See</u> <u>id.</u> Given that it is examining the bona fides of a single

sale, it is not unreasonable, nor contrary to Commerce's practice, to use NLMK's third

country sales as a benchmark. As explained by Commerce, doing so enables it to

---

[18] Plaintiffs and Defendant dispute Commerce's justification for not using the CBP data. <u>See</u> Def.'s Br. at 19 (arguing that Commerce properly disregarded the CBP data on entries of Russian HRC because it consisted of [[                                        ]]); <u>but see</u> Pls.' Br. at 18–20; Pls.' Reply Br. Confidential Version at 12, May 22, 2020, ECF No. 37 (citing Final Decision Memo at 13 n. 53) (arguing that Commerce's decision to disregard was based on an entry error). Even if it is the case, as Plaintiffs suggest, that Commerce could have expanded the scope of its query to include CBP data beyond [[                        ]], Pls.' Br. at 18–19, it is not unreasonable for Commerce to conclude that comparing NLMK's transaction to NLMK/NOVEX's third country sales is an appropriate methodology for determining whether the transaction is bona fide. <u>See</u> Final Decision Memo at 13–14. Commerce explains that it prefers to use transaction specific data, <u>id.</u> at 13, meaning that the raw data provides Commerce with a range of entries that may be averaged. <u>Id.</u> Moreover, according to Commerce, because the sample size of third country sales is large, and because NLMK's U.S. sales and third country sales are all export sales made through the same channel, Commerce finds the third country sales to be the most reliable benchmark for assessing whether NLMK's U.S. sale is bona fide. <u>Id.</u> Plaintiffs insist that the "concept of a 'transaction specific benchmark' is methodologically unsound," <u>see, e.g.,</u> Pls.' Br. at 20, 27, but fail to persuasively explain to the court how Commerce's methodological choice is unreasonable in this instance.

analyze the full range of shipments upon which it relies to construct a benchmark.
See id. at 12–13.

Finally, Plaintiffs argue there is nothing commercially unreasonable about arranging a transaction in such a way as to enable NLMK to seek an administrative review and obtain a lower dumping margin, particularly in light of commercial realities surrounding the sale.[19]  See, e.g., Pls.' Br. at 30, 39, 41–42.  It may be commercially reasonable to seek a lower dumping margin, and it is unsurprising that a company would seek to do so.  However, the court's position is to review whether Commerce reasonably supports its determination based on the factors enumerated in its totality-of-the-circumstances analysis.  As explained, Commerce adduces enough evidence to allow a reasonable mind to conclude that NLMK's transaction was not representative of its selling practices in the United States.  See Final Decision Memo at 12, 14.  As such, Commerce's determination is sustained.

---

[19] Plaintiffs argue that Commerce erred by applying its bona fides sales analysis in a vacuum and failing to consider record evidence that "prices in the U.S. market during the period of review were high and expected to increase due to the pending imposition of Section 232 tariffs."  Pls.' Br. at 30 (citing Customer-Specific Questionnaire Resp. at 11–12, PD 51, bar code 3716358-01 (June 8, 2018)).  However, it is reasonably discernible from Commerce's analysis of the email correspondences that it finds NLMK's purpose for making the sale was unrelated to market conditions in the United States.  See, e.g., Bona Fide Sales Memo at 11 (concluding that the correspondence "indicates that the sole U.S. sale made during the POR was designed and placed in the United States just prior to the end of the POR in order to revoke the antidumping duty order and was thus not based on normal business considerations."); see also, e.g., Final Decision Memo at 14.  The court declines to reweigh the evidence.

### III.   Commerce's Decision to Rescind the Administrative Review

Plaintiffs argue that Commerce lacks statutory authority to rescind the administrative review of its entry. <u>See</u> Pls.' Br. at 46–52. Defendant and Nucor counter that Commerce has authority to rescind an administrative review where there are no bona fide sales upon which to calculate a dumping margin. <u>See</u> Def.'s Br. at 40–41; Nucor's Br. at 41–44. For the following reasons, Commerce's decision to rescind the administrative review is sustained.

Upon request, 19 U.S.C. § 1675(a) directs Commerce to perform a periodic administrative review of an ADD order. As explained, Commerce has authority to determine an appropriate methodology when conducting an administrative review and may disregard U.S. sales if it finds that those sales are not bona fide. <u>See</u> §§ 1673(1), 1675(a), 1677a; <u>see also</u> <u>Ceramica</u>, 10 CIT at 404–05, 636 F. Supp. at 966 (citing <u>Chevron</u>, 467 U.S. at 843).

Here, Commerce explains that it is justified in rescinding the review because it lacks a bona fide U.S. sale upon which to determine NLMK's dumping margin. <u>See</u> Final Decision Memo at 17–18. The wording of § 1675(a) does not speak to the issue of whether Commerce must conduct and conclude an administrative review where it does not have a bona fide sale upon which to calculate a dumping margin. Commerce's determination is reasonable because, as it explains, "[c]alculating a rate based on a non-bona fide sale would create an inaccurate margin." Final Decision Memo at 17. As such, Commerce's determination to rescind the review is sustained.

Plaintiffs argue that Commerce's decision to rescind the administrative review impermissibly applies AFA to a cooperative respondent.  See Pls.' Br. at 52–55. Plaintiffs argument fails because Commerce is simply not applying facts available. See Final Decision Memo at 18.  Commerce uses facts available to address a gap in the record evidence when calculating a dumping margin for an exporter or producer. 19 U.S.C. § 1677e(a).  Here, Commerce is rescinding the review, and declining to calculate a new dumping margin for NLMK.  See Final Decision Memo at 17–18.  The consequence is that the 184.56 percent rate continues to apply.  Plaintiffs argue the rate is unreasonable as applied to them.  Yet, the all-others rate went unchallenged upon termination of the Suspension Agreement.  Parties had the opportunity to challenge the rate when Commerce issued the final results upon the lifting of the Suspension Agreement.[20]  19 U.S.C. § 1516a(a)(2)(A)(i)(II), (a)(2)(B)(i).  Neither Plaintiffs nor any other participant to the proceedings did.  The application of the rate in this case, as the all-others rate, is a function of the failure of Plaintiffs to make one or more bona fide sales.

---

[20] A party may challenge an ADD order based upon a final affirmative determination by filing in this Court both a summons, within 30 days of the order's publication in the Federal Register, and, within 30 days later, a complaint.  See 19 U.S.C. § 1516a(a)(2)(A)(i)(II), (a)(2)(B)(i).  Here, Commerce made a final affirmative determination that HRC from Russia is being sold at LTFV, and following the termination of the Suspension Agreement, published the ADD Order.  See HRC from Russia, 64 Fed. Reg. at 38,641; ADD Order, 79 Fed. Reg. at 77,456.  Neither Plaintiffs nor any participant to the proceeding commenced an action within 30 days of the publication of the ADD Order.

Court No. 19-00172                                                                       Page 25
**PUBLIC VERSION**

## CONCLUSION

For the foregoing reasons, Commerce's final determination is supported by

substantial evidence and in accordance with the law and is therefore sustained.

Judgment will enter accordingly.

<u>/s/ Claire R. Kelly</u>
Claire R. Kelly, Judge


Dated:          November 30, 2020
               New York, New York